317 So.2d 337

**Jerry Dean BRANTLEY**

v.

**STATE.**

**4 Div. 277.**

Court of Criminal Appeals of Alabama.

June 28, 1974.

Rehearing Denied July 16, 1974.

J. Paul Lowery, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Leon Ashford, Asst. Atty Gen., for the State.

TYSON, Judge.

The Grand Jury of Pike County, Alabama, charged the appellant with the unlawful possession of Marijuana.

The appellant filed pretrial motions to suppress the evidence and to quash the indictment, each of which were heard and denied in a joint hearing. Thereafter, the cause came on for trial, the jury found the appellant "guilty of possession of Marijuana for his personal use only," and assessed a fine of $1000.00. The trial court then entered its judgment in accordance with the verdict, and in addition ordered the appellant imprisoned in the county jail for eight months.

Corporal J. D. Hobby testified that on July 13, 1973, he was working as an undercover agent for the Department of Public Safety, in Pike County, Alabama, and had been so engaged for several months. He stated that at about 2:25 in the afternoon, he, accompanied by Investigator George Donald Smith, also of the State Department of Public Safety, went to the trailer home of the appellant and knocked on the door. He stated that the appellant opened the door and he asked, "Do you remember me," to which the appellant replied, "Yes, come on in." He stated that he was then seated in the living room of the trailer, and that the appellant's wife and daughter were also present at this time. He stated that he noticed a plastic bag with "brown-

ish vegetable material in it lying on a coffee table." He stated that he asked the appellant, "What's been going on," to which the appellant replied, "Oh, nothing much, man. Things have been happening around here and the heat is on." [R. 75] He stated that the "narcs" were in Troy and everybody was scared, that he was not holding anything then. Corporal Hobby stated that later in the conversation the appellant stated, ". . . What I had I got rid of and they can't dig up all the ground around my trailer. They will never find it. I am not holding anything. The only thing I am holding is what you see there on the table." [R. 76]

Officer Hobby further stated that following this conversation, he asked the appellant if he could invite his friend inside, to which the appellant replied, "It is hot outside, ask him to come on in." After Officer Smith came in, Corporal Hobby asked the appellant if he could sell him a lid, to which the appellant replied, "No. All I can do is roll you a number." He stated that the appellant then rolled a cigarette, and as he started to hand it to him he produced his badge and handed it to the appellant. He stated to him that he was an officer with the State Department of Public Safety, and that he was under arrest for the possession of Marijuana. [R. 78] The appellant then replied, "Oh, man, you are . . . me aren't you." Officer Hobby answered, "No, sir, I am not."

At this point, Officer Smith went outside, and, over the police radio, requested the assistance of other officers. Within approximately five minutes, two additional cars arrived, which included Chief John Lee of the Troy Police Department and two detectives, McLendon and Sutton in one car, in the other car were Deputy Phillips and Investigator Doug Nelson. He stated that the officers came inside, they were in civilian clothes, except Deputy Phillips, who was in his sheriff's uniform. He stated that the officers then read to the appellant a *Miranda* type warning and asked him if he fully understood

his rights, to which the appellant replied, "Yes, I do."

Officer Hobby further testified that he had a warrant for appellant's arrest on another charge when he entered the trailer, that after Chief Lee came in he showed the appellant a warrant for his arrest for the sale of Marijuana and placed him under arrest.

The officers then asked the appellant if they had his permission to search the trailer, to which the appellant replied that he understood about the necessity of getting a warrant, but for them to go ahead and search as he was not holding anything. [R. 81]

Officer Hobby further testified that Investigator Nelson then prepared a consent to search statement, written in longhand, that the two of them read it to the appellant, that the appellant said that he would sign it because he knew they could go ahead and get a warrant anyway. [R. 82] Officer Nelson again advised the appellant of his rights and of the necessity for getting consent before the appellant signed the consent to search statement. The officers then asked his wife if she too would sign it, after explaining her rights, and the wife joined in, signing the statement. [R. 82]

On cross-examination, Officer Hobby testified that the appellant had just lit the Marijuana cigarette, which he had rolled, and handed it to him when he placed him under arrest for possession of the Marijuana which he observed in a clear plastic bag lying on the coffee table. [R. 84–86]

Officer Hobby further stated that he had met the appellant on some two or three other occasions while doing undercover work in the Troy area.

Also on cross-examination, Officer Hobby testified that, after the officers began searching the trailer, and upon finding several items of contraband and the three bags of Marijuana in the bedroom, the ap-

pellant said, "Hell, I forgot about that." [R. 110]

Officer Doug Nelson testified that he was an Investigator for the State Department of Public Safety, and, in the company of Sheriff's Deputy Carl Phillips, went to the trailer home of the appellant on the afternoon of July 13, 1973. He stated that they were summoned there by a police radio. Upon arrival, he stated that the appellant, his wife and child, and Officers Smith and Hobby were inside the trailer. He stated that he sat down in the living room and talked with the appellant, reading him a *Miranda* card warning before beginning his conversation with him. He stated that Corporal Hobby had a warrant in his pocket for the arrest of the appellant on another charge, and that Chief Lee of the Troy Police Department came in with two detectives; that after explaining the appellant's rights to him, he stated to them, "Go ahead and search, I am not holding anything. I know that you could go ahead and get a search warrant anyway." [R. 114] He stated that he conversed further with the appellant and his wife, and that he prepared a consent to search form, which each of them signed after having their rights again explained to them. [R. 114–115] He stated that he then assisted in the search of the home and found a "Set of Ohause scales," which measure up to 3,210 grams, and that near the scales were vegetable material and seeds. He stated that in the bedroom he found several suitcases; that he opened one of these and found three kilos of green vegetable material and a plastic bag containing 3,456 double scored purple tablets. [R. 117] He stated that he later delivered this material, that evening, to the State Department of Toxicology for examination. [R. 118] He stated that the Marijuana in the suitcase approximated six pounds. [R. 124].

Troy Police Officer Charles Sutton testified that he participated in the search of the appellant's trailer home on the afternoon of July 13, 1973, and upon removal of some drawers, which had been built into the wall in the bedroom, he found three bricks he believed to be Marijuana. He turned these over to Investigator Doug Nelson at that point. [R. 126–127]

Officer Sutton, on cross-examination, stated that he did not know a man named "Fudd," but that the appellant stated, 'Fudd's the guy. I didn't know they were there. I thought the fat son of a bitch got them." [R. 131]

Troy Police Officer James McLendon testified that he participated in the search of appellant's trailer home on the afternoon of July 13, 1973. He stated that he found and seized a "hashish pipe, and a green cigarette case that had one red capsule and a half a white tablet in it." He stated that he also found three partially smoked roches in an ash tray. [R. 134–135]

George Donald Smith testified that he was a narcotics investigator for the State Department of Public Safety. He testified that on the afternoon of July 13, 1973, he accompanied J. D. Hobby to the trailer home of the appellant, near Troy, Alabama. He stated that after Corporal Hobby went inside, he emerged about five minutes later and asked him to come in, which he did. He stated that he was seated on the couch beside the appellant when Officer Hobby asked him if he had anything to sell, and he replied that all he had was a lid of Marijuana lying on the coffee table, that the best he could do was to roll him a number. Officer Smith stated that after the appellant rolled the cigarette and lit it, Officer Hobby handed him his identification paper and advised him that he was under arrest for the possession of Marijuana.

Officer Smith further testified that later in the afternoon he assisted in the search of the trailer home and found eight yellow tablets in a plastic bag, and subsequently four purple tablets on a night stand in a back bedroom. [R. 137–139]

Troy Police Chief John Lee testified that he arrived at the home of the appel-

lant on the afternoon of July 13, 1973, accompanied by two Troy police officers; that he was present in the trailer when the appellant and his wife signed the consent to search form, and that each of them were given the *Miranda* type warning before signing this. He stated that in his search he found several burned roches or "ends of cigarettes" in an ash tray, which he believed to be Marijuana. [R. 141–142]

Dale Carter, an employee of the State Department of Toxicology, verified that Officer Hobby and Officer Nelson delivered to him several items at about 9:00 in the evening of July 13, 1973, at the Crime Laboratory at Enterprise, Alabama, that he inventoried the items and turned them over to Mrs. Mary Wisdom of that office for examination. He stated that there were six bricks of green vegetable material and a blue box containing approximately 3,456 quarter scored tablets among the items. [R. 144–148]

Mrs. Mary Wisdom testified that she was employed by the State Department of Toxicology on July 13, 1973, and did receive from Dale Carter of that Department several items, which she identified as containing Marijuana, the total quantity being 5,432.52 grams, or 11.95 pounds. She further testified that upon examination of the tablets, she determined the eight yellow tablets to contain lysergic acid diethylamide, commonly called LSD. She also examined the powder contained in a plastic bag and determined that it had 59.6 milligrams of a beige powder, which an examination revealed to be a mixture of cocaine and procaine. [R. 152]

The appellant's motion to exclude the State's evidence was overruled. [R. 159–161] The appellant presented the testimony of two character witnesses, Harry Frank Baker and Senator L. L. Dozier. [162–164]

The appellant's wife testified that she had been present at their trailer home, near Troy, Alabama, on the afternoon of July 13, 1973, with her husband and daughter, when Officers Hobby and Smith arrived. She testified that she had prescriptions for some of the items seized, particularly one bottle containing brown and white capsules, from Dr. Hanna, one from Dr. Dotson, and that Dr. Sachs had given her a prescription for some pink and orange capsules. She testified that the two officers had talked with her husband for ten or fifteen minutes before they stated to him that he was under arrest. She stated that shortly thereafter three other officers came in, and Chief Lee read them their rights while seated in the kitchen area of their trailer home; that after that she and her husband signed a consent to search form. She stated that a man named "Fudd" had been by their home previously and left a suitcase in which the officers found three bricks of Marijuana. [R. 165–174]

The appellant testified in his own behalf, indicating that he was a salesman for a wholesale concern in Montgomery. He testified that they were living in their mobile home just out the Henderson Highway from Troy. He stated that on the morning of July 13, 1973, a man by the name of "Fudd," whose real name was Richard Bolli, had come by his home and left a suitcase, as he was going to visit some friends in town. He stated that the man never returned, and that it was in this suitcase that the three bricks of Marijuana were found by the officers. He stated that he had seen Officer Hobby two or three times before, and knew him only as "J. D." He stated that the officer had long hair and was in civilian clothes when he had seen him before, and also when he came by the trailer home that afternoon. Appellant admitted stating to the officer that he did not have any drugs to sell, but that he would roll him a joint from that which was lying on the coffee table. Appellant admitted, on cross-examination, that Officer Doug Nelson had read his *Miranda* rights to him, but stated that the officers said they could go get a search warrant, so he signed the consent to search form. [R. 176–184]

## I

The appellant, just prior to trial, made an oral motion to quash the indictment on the basis that there was a "disproportionate number of jurors on the venire over fifty years of age, and a lesser number of persons under thirty years of age." Appellant also stated there had been a systematic exclusion of members of the African race from the venire. [R. 67–68] In denying this motion, the trial court indicated that on the previous day a companion case, involving the appellant, had been tried; that on this jury there were six members of the African race and six members of the white race, some of whom were female and some male; that he had excused those persons who had served on the jury the previous day from the venire from which the jury was being selected in the instant case.

Here, the record fails to show any evidence in support of this motion by the appellant that the members of the jury commission were influenced by racial considerations in selecting persons for jury service. There was no evidence that the jury commission had applied different standards of qualification to members of the Negro community, or to older or younger persons living in the community. In sum, there was no evidence presented to indicate that the prospective jurors, who made up the venire, were selected on the basis of anything other than individual qualifications.

In *Thigpen v. State,* 49 Ala.App. 233, 270 So.2d 666, we find:

"In the first place, it is now quite clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him, nor on the venire, or grand jury which indicted him. *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; *Swain v. State of Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

"We feel that the applicable rule of law is to be found in *Junior v. State,* 47 Ala.App. 518, 257 So.2d 844, cert. denied 288 Ala. 744, 257 So.2d 852, as follows:

" 'The appellant's contention in this case must be grounded upon proof that Negroes [and those persons between the ages of twenty one and thirty] have been the victims of improper discrimination and exclusion from jury service in the jury selection process. But purposeful discrimination must be proven and may not be assumed or merely asserted, and the quantum of proof necessary to establish such fact is a matter of federal law. *Swain, supra.*' "

It is clear therefore that the trial judge correctly denied appellant's motions to quash the jury venire on the ground indicated. *Butler v. State,* 285 Ala. 387, 232 So.2d 631; *White et al. v. State,* 48 Ala. App. 111, 262 So.2d 313; *Bryant and Williams v. State,* 49 Ala.App. 359, 272 So.2d 286; *Jackson v. Morrow,* 404 F.2d 903.

The trial court properly excused the jurors, who had served on the companion case involving the appellant the previous day, from the venire from which the jurors in the instant case were being selected. *Leonard v. United States,* 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028; *Dunaway v. State,* 291 Ala. 93, 278 So.2d 205.

## II

Prior to trial, the appellant also moved for a mistrial because the trial court asked the question of the venire, "Is any juror related by blood or marriage to any degree to L. L. Dozier?" also, "Does any juror do business with L. L. Dozier?"

In overruling the motion for a mistrial, the court determined that Mr. Dozier had testified in a companion case the previous day on behalf of the appellant, and had been observed in the courtroom, while the venire was being qualified, conferring

with defense counsel. Under these circumstances, we believe the trial court's action in asking these questions of the venire, and overruling appellant's motion for mistrial based on same, was proper. Title 30, Section 55, Code of Alabama 1940; *Williams v. State,* 51 Ala.App. 1, 282 So.2d 349, cert. denied 291 Ala. 803, 282 So.2d 355.

## III

The appellant contends that there was an unlawful search and seizure, as the officer entered the home of the appellant "under the guise of friendship," and that five additional officers were present when the consent to search was signed, citing *Rueffert v. State,* 46 Ala.App. 36, 237 So.2d 520.

In *Duncan v. State,* 278 Ala. 145, 176 So.2d 840, the rule was stated by Mr. Justice Lawson in this manner:

"When police officers want to search a person's home they must have either a search warrant or a knowing, voluntary permission, unless the search is incidental to a lawful arrest or there are other circumstances, not present in this case, which justify a departure from the rule. *Waldron v. United States,* 95 U.S.App. D.C. 66, 219 F.2d 37. *See United States of America v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59."

While it is true that the officers were dressed in civilian clothing, they did knock and were admitted by the appellant on the basis that he knew Officer Hobby. Moreover, Officer Hobby testified that he had a warrant for the appellant's arrest in his pocket, which he subsequently presented to the appellant after the appellant rolled and offered him the Marijuana cigarette from the lid of Marijuana lying in plain view on the coffee table.

■ As noted in *Grisson v. State,* 51 Ala.App. 285, 284 So.2d 739, cert. denied 291 Ala. 780, 284 So.2d 740, "An undercover police officer engaged in acts to uncover violations of law is not an accomplice of one charged with such violation." Cases cited.

■ Furthermore, an officer may, when acting in good faith, with a view to detect crime, make use of deception, trickery, or artifice. *Johnson v. State,* 36 Ala.App. 634, 61 So.2d 867, and cases cited therein.

■ Further, the testimony in this cause establishes that the appellant was given his full *Miranda* rights by the officers before any search was made, and in fact the appellant and his wife, each, signed the "consent to search." We are of the opinion that the evidence in this cause establishes that the appellant's consent was voluntarily given after being fully advised of his constitutional rights. The trial court's conclusion in this respect is adequately supported by the facts. *Shewey v. State,* 48 Ala.App. 730, 267 So.2d 520; *Hardy v. State,* 51 Ala.App. 489, 286 So.2d 899; *Loper v. State,* 44 Ala.App. 204, 205 So.2d 521.

The arrest and resulting search and seizure in the instant case were proper.

## IV

The applicant contends that he was induced or lured by the arresting officers into the commission of the offense in question, and asserts the defense of entrapment.

Presiding Judge Carr, in *Johnson v. State,* 36 Ala.App. 634, 61 So.2d 867, stated:

"The pertinent parts of Sec. 45, 22 C.J.S. Criminal Law § 45, p. 100 et seq. are as follows:

" 'The doctrine of entrapment, however, has a limited application, the basic thought being that officers of the law shall not incite crime merely to punish the perpetrator; hence a distinction has been drawn between the inducing of an innocent person to do an unlawful act, and the setting of a trap to catch one in the execution of a criminal plan of his

own conception, an act of the latter character by an officer not being regarded as against public policy, and entrapment is not available as a defense to a person who has the intent and design to commit a criminal offense and who in fact does commit the essential acts constituting it, merely because an officer of the law, in his effort to secure evidence against such person, affords him an opportunity to commit the criminal act, or purposely places facilities in his way or aids and encourages him in the perpetration thereof.

" 'An officer may, when acting in good faith with a view to detecting crime, make use of deception, trickery, or artifice; and so it is not a defense that decoys were used to present an opportunity for the commission of the crime or that detectives or others feigning complicity in the act were present and apparently assisting in its commission. Especially is this true in that class of cases where the offense is one of a kind habitually committed, and the solicitation merely furnishes evidence of a course of conduct; it has been held that in such cases the entrapper may even provoke or induce the commission of a particular violation of the law, if he knows or has reasonable grounds to believe that accused is a repeated or habitual offender.' "

More recently, this court in *Miller v. State*, 52 Ala.App. 213, 298 So.2d 633, 1974, held:

"Of particular importance on the question of inducement of appellant to commit the crime is *Lindsay v. State*, 41 Ala.App. 85, 125 So.2d 716, cert. stricken, 271 Ala. 549, 125 So.2d 725; *Garsed v. State*, 50 Ala.App. 312, 278 So.2d 761.

"Other cases from this jurisdiction where the criminal sale of unlawful commodities such as liquors, narcotics, etc., were made at the solicitation and request of officers whose identity was disguised are *Webb v. State*, 42 Ala.App. 385, 166

So.2d 510; *Dodd v. State*, 32 Ala.App. 307, 26 So.2d 273, cert. denied 248 Ala. 103, 26 So.2d 274; *Nelson v. City of Roanoke*, 24 Ala.App. 277, 135 So. 312, cert. denied 223 Ala. 317, 135 So. 314. These cases hold that where the appellant is disposed to commit the crime and the officers merely provide the opportunity by request or encouragement to commit the criminal act, there is no entrapment. See *Alabama Digest*, Criminal Law, Volume 6, Key number 37."

■ Under the circumstances in this case, and the authorities herein cited, we see no room for the operation of the defense of entrapment in the instant case.

V

The appellant at trial objected to the introduction of evidence of other "hard drugs or other controlled substances" as evidence of other offenses, other than that for which he was on trial.

■ The testimony and evidence pertaining to the additional Marijuana, other than that found in the pouch on the coffee table, including the bricks of Marijuana found in the suitcase, and the Marijuana found in the wall behind the dresser in the bedroom, were properly admitted in evidence as relevant to the issue charged in the indictment, to-wit, the possession of Marijuana, contrary to law. *Morrow v. State*, 52 Ala.App. 145, 290 So.2d 209, cert. denied 292 Ala. 743, 290 So.2d 213, and authorities therein cited. Likewise, the scales and hashish pipe were admissible on the subsidiary issue vel non of the possession for personal use only.

■ However, the admission into evidence of the testimony, and the LSD tablets and the packet of Cocaine powder, was prejudicial error. *Mason v. State*, 259 Ala. 438, 66 So.2d 557, 42 A.L.R.2d 847; *Brasher v. State*, 249 Ala. 96, 30 So.2d 31; *Garner v. State*, 269 Ala. 531, 114 So.2d 385.

**502**

These "hard drugs or other controlled substances," i. e., the LSD tablets and Cocaine powder, have no relevancy to the character of the drug here at issue. *Tadlock v. State,* 45 Ala.App. 246, 228 So.2d 859; *Parks v. State,* 49 Ala.App. 32, 268 So.2d 498, cert. denied 289 Ala. 749, 268 So.2d 501; *Van Nostrand v. State,* 51 Ala.App. 494, 286 So.2d 903, cert. denied 291 Ala. 799, 286 So.2d 906.

For the above stated reasons, the judgment in this cause is due to be reversed and the cause remanded.

Reversed and remanded.

All the Judges concur.